**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADAR BAYS, LLC<br><br>                                    Plaintiff,<br><br>          v.<br><br>GENESYS ID, INC. f/k/a RX SALES, INC.<br><br>                                    Defendant. | **Civil Action No.:**<br><br>**VERIFIED COMPLAINT** |

Plaintiff, Adar Bays, LLC. ("Plaintiff" or "AB"), by and through its undersigned attorneys, Garson, Ségal Steinmetz, Fladgate LLP, brings its Verified Complaint against Defendant, GeneSYS ID, Inc. ("Defendant" or "GNID") and respectfully alleges as follows:

## THE PARTIES

1.      Plaintiff Adar Bays, LLC is a limited liability company duly organized under the laws of the state of Florida, having a principal place of business located at 3411 Indian Creek Drive, Suite 403, Miami Beach, FL 33140.

2.      Upon information and belief, Defendant GeneSYS ID, Inc. is a corporation organized and existing under the laws of the State of Nevada, having a principal place of business located at 170 Green Valley Parkway, Suite 300, Henderson, Nevada, 89012.   GNID is traded publicly on the Over-The-Counter Market under the symbol "GNID."   GNID was known as RX Sales, Inc. until July 20, 2016, when RX Sales, Inc. filed a Form 8-K with the Securities and Exchange Commission ("SEC"), formally changing its name to GeneSys ID, Inc.  (Accordingly, hereinafter, "GNID" shall refer to both RX Sales, Inc. and GeneSys ID, Inc.)

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is proper in this judicial district pursuant to 27 U.S.C. §1391(a), in that it is a district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject of this action is situated.

5.      Further, the agreement from which this dispute arises designates that it is governed and construed in accordance with the laws of the State of New York and that any action brought by either party against the other must be brought in New York.

## FACTS COMMON TO ALL CLAIMS

### The Note

6.      On or about May 24, 2016, GNID issued a $35,000.00, 8% Convertible Redeemable Note to AB (the "Note").  A true and correct copy of the Note is attached hereto as **Exhibit A**.  The Note states that GNID would pay AB $35,000.00 plus interest on May 24, 2017.

7.      The Note provides that AB is entitled to convert all or any amount of the outstanding balance of the Note into shares of GNID Common Stock (the "Common Stock").  Specifically, Section 4(a) of the Note provides, in pertinent part:

> The Holder of this Note is entitled, at its option, after full cash payment for the shares convertible hereunder, **after 180 days from the date of the note,** to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the Common Stock") at a price ("Conversion Price") . . . (Exhibit A, § 4(a) (emphasis original)).

8.      The Conversion Price was to be determined for each share to be equal to:

> 65% of the **lowest trading price** of the Common Stock as reported on the National Quotations Bureau OTCQB exchange which the Company's shares are traded or any exchange upon which the Common Stock may be traded in the future ("Exchange"), for the ***twenty*** prior trading days including the day upon which a Notice of Conversion is received by the Company… (Exhibit A, § 4(a) (emphasis original)).

9.      The mechanics of converting the Note required AB to submit a Notice of Conversion.  Section 4(a) of the Note provides, in pertinent part:

> . . . (provided such Notice of Conversion is delivered by fax or other electronic method of communication to the Company or its transfer agent after 4 P.M. Eastern Standard or Daylight Savings Time of the Holder wishes to include the same day closing price). (Exhibit A, § 4(a))

10.      The conversion feature was essential in inducing AB to purchase the Note.  Investment in GNID came with significant risk due to its unstable financial condition, specifically, its high net loss and limited revenue, as well as the company's own substantial doubts about the ability of GNID to continue as a going concern without further investment.  AB was only willing to purchase the Note if it could earn a return commensurate with the risk.  The conversion feature of the Note allowed for such a return.  AB's ability to obtain stock at a discount to the market price then resell it on the open market afforded AB the opportunity to obtain a return on its investment from third parties and at a significantly higher rate of return.  Any failure by GNID to honor Conversion Notices, therefore, would deprive AB of the essential benefit for which it negotiated, and for which it purchased, the Note.

11.      To ensure the availability of shares for the purposes of conversion under the Note, Section 12 thereunder provides that GNID would initially "issue

irrevocable transfer agent instructions reserving 278,000 shares of its Common Stock for conversions under this Note (the "Share Reserve")." (Exhibit A, § 12). It also provides that "The company should at all times reserve a minimum of three times the amount of shares required if the note would be fully converted." (Id.) The Note also provides that the "Holder may reasonably request increases from time to time to reserve such amounts." (*Id.*)

### GNID's Willful Refusal to Honor AB's Notice of Conversion

12.     On or about November 28, 2016, AB duly submitted a Notice of Conversion to GNID for a portion of the Note.  Specifically, five thousand dollars ($5,000.00) of the principal amount of the Note was to be converted into 439,560 shares of GNID Common Stock, representing a conversion price of $0.011375 per share. A true and correct copy of the November 28, 2016 Notice of Conversion is annexed hereto as **Exhibit B**.

13.     In response to GNID's failure to honor AB's request for conversion, on or about December 15, 2016, AB, through counsel, sent a Default Notice Letter to GNID's CEO, Lorraine Yarde, reminding her of GNID's obligations under the Note, demanding that the shares be delivered, and informing her that the default interest and liquidated damages contained in the Note were accruing.

14.     GNID has willfully refused to honor the Note, placing the company in default of Section 8(c), 8(k), and other provisions of the Note.

15.     Pursuant to Section 8(n) of the Note, default interest at a rate of 24% per annum is now accruing and will continue to accrue until the shares are delivered. Further, pursuant to the same Section, liquidated damages in the amount of $250 per day began to accrue on December 1, 2016, and escalated to $500 per day on December 7, 2016.  The daily liquidated damages will continue to accrue until the shares are delivered.

16.     To date, GNID has not delivered the shares.

17.     GNID's obligation to deliver the 439,560 shares of Common Stock requested in the November 28, 2016 Notice of Conversion and pursuant to the terms of the Note is clear and indisputable.  GNID's failure to deliver those shares

of Common Stock, in violation of its contractual obligation to do so, is similarly clear and indisputable.

### GNID's Admission of its Breach of Section 12 of the Note

18.     As indicated in Paragraph 11, *supra*, Section 12 of the Note dictates that GNID must establish a Share Reserve with a transfer agent to effectuate conversions.  Section 12 also provides that the GNID must "at all times reserve a minimum of three times the amount of shares required if the [N]ote were to be fully converted." (Ex. A, § 12).

19.     By GNID's own admission, it deliberately breached this provision of the Note for the purpose of preventing AB from converting under the Note.

20.     In GNID's Form 10-Q Quarterly Report for the period ended September 30, 2016, filed with the SEC on November 21, 2016 and signed by Ms. Yarde, GNID stated on Page 39:

> To address this these ongoing concerns, the Company terminated its transfer agent on September 6, 2016, preventing further toxic conversions and bringing all parties to the table to discuss a satisfactory settlement which would provide the Company with a window to redeem the outstanding notes over an extended period of time and prevent any further conversions for several months.

A true and correct copy of the 10-Q Quarterly Report is annexed hereto as **Exhibit C**.

21.     In other words, GNID severed its relationship with its transfer agent, knowing that it would vitiate the purpose of the Note, in an effort to gain leverage over noteholders so that the Company could pay back the notes over time.

### GNID's Breaches

22.     GNID's calculated and deliberate actions have led to no less than four (4) breaches of the Note.

23.     First, GNID's failure to deliver 439,560 shares of its Common Stock to AB is an Event of Default.  Section 8(k) states that an event of default shall occur if:

> The Company shall not deliver to the Holder the Common Stock pursuant to paragraph 4 herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion. (Exhibit A, § 8(k)).

24.     The right to conversion is unequivocal, and central to the entire agreement. By not delivering the shares, or hindering delivery of such in any way, GNID is in breach of the Note.

25.     Second, Section 8(b) states that an Event of Default shall occur if:

> Any of the representations or warranties made by the Company herein or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Note, or the Securities Purchase Agreement under which this note was issued shall be false or misleading in any respect. (Exhibit A, § 8(b)).

26.     In conducting itself in this manner, GNID has breached numerous representations and warranties under the Note.  Among others, GNID has breach its each representation regarding delivery of shares, regarding maintaining a Share Reserve, and regarding repayment of the Note upon maturity.

27.     Third, and similarly, Section 8(c) states that an Event of Default shall occur if "The Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder."

28.     Fourth, by terminating its relationship with its transfer agent, GNID breached Section 12 of the Note.

29.     As of the date of filing, GNID has not delivered the shares, nor has it re-established a Share Reserve.  Accordingly, the Company in clear breach of the Note.

30.     At no point has AB ever, whether formally or informally, in writing or orally, waived GNID's defaults.

**Remedies**

31.      Due to GNID's persistent and willful failure to remedy its breaches, AB has incurred significant damage.  Since the Notice of Conversion was delivered on November 28, 2016, the trading price of GNID stock has varied significantly, fluctuating from a high of $0.046 per share on November 29, 2016 to a low of $0.012 per share on several days in January and February.  A true and accurate copy of a chart showing GNID's stock price from November 28, 2016 to date is annexed hereto as **Exhibit D**.  The trading volume of the stock has also fluctuated greatly. For example, on January 9, 2016, the trading volume was 159,498 and on February 7, 2016, the trading volume was 0.  Such volatility shows that had GNID issued the shares to AB upon the Notice of Conversion, there were days when AB could have sold a significant proportion of its 439,560 shares of converted stock and there were days when LG would not have been able to sell a single share.

32.      Section 8(n) of the Note provides for separate default damage calculations, depending on the type of event of default.  With regard to a default for failure to deliver shares under 8(k), the Note articulates that GNID is to pay AB liquidated damages in the amount of $250 per day beginning on the fourth day after the notice of conversion was delivered, escalating to $500 per day beginning on the tenth day after the notice of conversion was delivered until the shares are duly delivered.

33.      GNID received the Notice of Conversion on November 28, 2016, making the deadline to deliver December 1, 2016.  Accordingly, pursuant to the agreed-upon terms of the Note, default payments which are due and owing to AB have accrued to over $36,500.00 as of the date of filing, and continue to accrue daily.

34.      AB has been further damaged by the anticipatory breach caused by GNID's clear intention to not honor further conversions.  Based on the high trading price of GNID stock in the time since AB submitted its notice of conversion, $.046, AB could have sold its 439,560 shares of stock for $20,217.  Based on the converted amount of $5,000.00, this figure represents a return of 4.04 per dollar.  Applying

this ratio to the remaining balance of the Note, $30,000.00, AB's damages from GNID's anticipatory breach would be would be approximately $121,000.00.

35.     Furthermore, upon any event of default under the Note, interest is to accrue at a default rate of twenty-four (24%) percent per annum.  Consequently, in addition to the default payments and damages, interest on the Note is accruing at a rate of twenty-four percent (24%) each day.

36.     Section 7 of the Note states that "The Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note." (Exhibit A, § 7).  Therefore, AB is entitled to all costs and attorneys' fees associated with enforcement and collection under the Note.

37.     This provision is reinforced by Section 8 of the Note, which states that "If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding." (Exhibit A, §8).

38.     Finally, the parties agree in Section 9 that "In case any provision of this Note is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Note will not in any way be affected or impaired thereby." (Exhibit A, § 9).

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

39.     AB re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40.     A valid contract exists between AB and GNID.

41.     AB performed all of its obligations under the contract.

42.     GNID breach the contract by failing to deliver shares due and owing to AB, and by failing to maintain the requisite reserve of shares for AB.

43.     AB has been damaged by GNID's failure to perform.

44.     AB, therefore, is entitled to an award of damages in an amount to be determined at trial, but not less than one hundred and fifty thousand dollars ($150,000.00).

## SECOND CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

45.     AB re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 of this Complaint as if fully set forth herein.

46.     GNID has failed to make restitution for the monies loaned to it by AB pursuant to the terms of the Note.

47.     GNID accepted AB's money under such circumstances that it created a legal or equitable obligation to account for the money, and has not made restitution to AB.

48.     AB, therefore, is entitled to an award of damages in an amount to be determined at trial, but not less than one hundred and fifty thousand dollars ($150,000.00).

## THIRD CLAIM FOR RELIEF
### (ANTICIPATORY BREACH OF CONTRACT)

49.     AB re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50.     A valid contract exists between AB and GNID.

51.     AB performed all of its obligations under the contract.

52.     GNID has made clear that in does not intend to perform its future obligations under the contract.

53.     AB has been damaged by GNID's failure to perform.

54.     AB, therefore, is entitled to an award of damages in an amount to be determined at trial, but not less than one hundred and fifty thousand dollars ($150,000.00).

## FOURTH CLAIM FOR RELIEF
### (COSTS, EXPENSES & ATTORNEYS' FEES)

55.     AB re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     In accordance with Sections 7 and 8 of the agreement between the parties, GNID agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by AB in collecting any amount under the Note.

57.     Therefore, AB is entitled to an award against GNID for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff AB Adar Bays, LLC seeks judgment against Defendant GeneSYS ID, Inc. as follows:

i.      On the First, Second, and Third Claims for Relief, for damages in an amount to be determined at trial, but not less than one hundred and fifty thousand dollars ($150,000.00); and

ii.     On the Third Claim for Relief for an award of AB's costs and expenses in prosecuting this action, including reasonable legal fees; and

iii.    On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and

iv.     For such other further relief as the Court may deem just, proper, and in the interest of justice.

DATED:      NEW YORK, NEW YORK
            FEBRUARY 15, 2017


                          RESPECTFULLY SUBMITTED,


                          GARSON, SEGAL,
                          STEINMETZ, FLADGATE LLP
                          *ATTORNEYS FOR PLAINTIFF*


                          BY:      _____/s/_____
                                   KEVIN KEHRLI (KK1536)
                                   MICHAEL STEINMETZ (MS3164)
                                   164 WEST 25TH STREET
                                   SUITE 11R
                                   NEW YORK, NY 10001
                                   TELEPHONE: (212) 380-3623
                                   FACSIMILE: (347) 537-4540
                                   EMAIL: KK@GS2LAW.COM