## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ADAR BAYS, LLC<br><br>Plaintiff,<br><br>v.<br><br>GENESYS ID, INC.<br><br><br><br>Defendant. | *Filed  Electronically*<br><br><br>**Civil Action No.:**<br>**1:17-cv-1175-ALC** |

---

## DEFENDANT GENESYS ID, INC.'S MEMORANDUM OF LAW
## IN SUPPORTOF IT'S MOTION TO DISMISS

---

**THE BASILE LAW FIRM, P.C.**
MARK R. BASILE, ESQ. (MB2201)
*Attorneys for Defendant*
GeneSYS ID, Inc.
68 S. Service Rd., Ste. 100
Melville, NY 11747
Telephone: (516) 455-1500
Fax: (631) 498-0478
mark@thebasilelawfirm.com

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

LEGAL ARGUMENT ........................................................................................................6

      POINT I ..............................................................................................................6

THE FEDERAL COURT DOES NOT HAVE ORIGINAL JURISDICTION OVER
THIS MATTER AND THIS CASE SHOULD BE DISMISSED ..............................6

    A. Plaintiff Cannot Satisfy The Requirement For The Amount in Controversy…..7

    B. The Maximum Damages are well below the Diversity Threshold……………..11

    C. Plaintiff Has Failed To Plead Diversity of Citizenship………………………..12

      POINT II...........................................................................................................13

CONFLICTING FORUM SELECTION CLAUSES – VENUE IS IMPROPER .....13

    D. The Forum Selection Clause in the Note Controls the Issues of Jurisdiction and
       Venue ..........................................................................................................13

    E. The Test In New York For Venue with Competing Forum Selection Clauses
       Is The 'Claims Arisen From' Test ..................................................................19

CONCLUSION .................................................................................................22

# **TABLE OF AUTHORITIES**

**Page**

*Arnold v. Troccoli,*
     344 F.2d 842 (2nd Cir. 1965) .........................................................................6

*Caperton v. A.T. Massey Coal Co.,*
     225 W. Va. 128, 132, 690 S.E.2d 322, 328 (2009)…………………………...15

*Carden v. Arkoma Associates,*
     494 U.S.185 (1990)  ...................................................................12, 13

*Celerant Tech. Corp. v. Overland Sheepskin Co.,*
     2007 U.S. Dist. 8851 (S.D.N.Y. Jan. 29, 2007)……………………………...18

*CooperVision, Inc. v. Intek Integration Tech., Inc.,*
     2005 NY Slip Op 25060, 7 Misc. 3d 592, 794 N.Y.S.2d 812 (Sup. Ct.)…21, 22

*Crenshaw v. Great Cent. Ins. Co.,*
     482 F.2d 1255 (8th Cir. 1973)…………………………………………………6

*Edwards v. Bates County,*
     163 U.S. 269 (1896)……………………………………………………....7

*Elfand v. Widman,*
     284 F. Supp. 498 (S.D.N.Y. 1968)……………………………………………6

*Hester v. Navigators Ins. Co.,*
     917 F. Supp. 2d 290, 296 (S.D.N.Y. 2013)…………………………………14

*Kent v. Universal Film Mfg. Co.,*
     200 A.D. 539, 193 N.Y.S. 838 (App. Div. 1922)……………………19, 20, 21

*Knowles v. Toone,*
     96 N.Y. 534 (1884)……………………………………………………...19

*Lenz v. Associated Inns & Restaurants Co. of Am.,*
     833 F. Supp. 362 (S.D.N.Y. 1993)……………………………………………12

*LG Capital Funding, LLC v. Sanomedics Intl. Holdings, Inc.*
          2015 NY Slip Op 32232(U) (Sup. Ct.)…………………………………………..17

*LG Capital Funding, LLC v PositiveID Corporation, Index No. 1:17-cv-1297*, U.S.D.C.,
E.D.N.Y (Order dated June 12, 2017)…………………………………………… .. 11, 12

*Mastrobuono v. Shearson Lehman Hutton*,
          514 U.S. 52, 53, 115 S. Ct. 1212, 1214 (1995)………………………….....15

*Madden v. Midland Funding, LLC*,
          No. 11-CV-8149 (CS), 2017 U.S. Dist. 27109 (S.D.N.Y. Feb. 27, 2017)…...13

*Meding v. Receptopharm, Inc*.,
          462 F. Supp. 2d 348 (E.D.N.Y.  2006)  ...................................................7, 8

*Nau v Vulcan Rail & Const. Co.,*
          286 NY 188, 197 [1941])…………………………………………………..20

*Sahara Sam's Oasis, LLC v. Adams Cos*.,
          Civil Action No. 10-0881 (RMB/AMD), 2010 U.S. Dist. 82034 (D.N.J. Aug. 12,
2010)…………………………………………………………………………………..14

*Smith v. Shields Sales Corp.*,
          2005 NY Slip Op 7775, 22 A.D.3d 942, 802 N.Y.S.2d 764 (App. Div.)….. 16

*Teletech Europe B.V. v Essar Servs. Mauritius*,
          2011 Slip Op 02957 (83 AD 3d 511)………………………………………… 20

*Tongkook Am., Inc. v Shipton Sportwear Co.,* 14 F. 3d 781 (2d. Cir. 1994) …….…….. 12

*Transaero,  Inc. v. La Fuerza Area Boliviana,*
          24 F.3d  457 (2d  Cir. 1994) ...................................................................7

*Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.,*
          106 A.D.2d 242, 243, 485 N.Y.S.2d 65, 66 (App. Div. 1985)………………...15

 *Union Capital LLC v. Vape Holdings Inc,*
          No. 16-cv-1343 (RJS), 2016 U.S. Dist. 72973 (S.D.N.Y. Mar. 8,
2016)……………………………………………………………………...8, 15, 17, 22

 *Unity Creations, Inc. v. Trafcon Indus.,*
          137 F. Supp. 2d 108 (E.D.N.Y. 2001)………………………………………...14

*West v. Am. Tel. & Tel. Co.,*
     311 U.S. 223, 61 S. Ct. 179, 181, 183 (1940)…………………………….....13

## **FEDERAL  STATUTES AND REGULATIONS**

28 U.S.C. §1332 ................................................................................. 2

Fed. R. Civ. P. Rule 12(b)(1)………………………………………....1, 22

Fed. R. Civ. P. Rule 12(b)(3)………………………………………1, 22

Defendant GeneSYS ID Inc. ("GNID") submits this brief in Support of its Motion to Dismiss for Lack of Original Jurisdiction and alternatively, under F.R.C.P. 12(b)(1), 12(b)(3) for dismissal for improper venue and Forum Non-Conveniens.

## PRELIMINARY STATEMENT

This is a breach of contract case regarding a $35,000.00, 8% Convertible Note ("Note"), and a Securities Purchase Agreement ("SPA") between the parties.[1] Plaintiff claims that GNID failed to convert part of the principle of the Note into shares of GNID common stock and is in default of the Notes terms and is seeking in excess of $150,000.00 in damages for its breach.

For plaintiff to assert its state law claims in federal court, it must first establish the legal requirements for original jurisdiction.

As to original jurisdiction based on diversity, a party must demonstrate to a legal certainty an amount in controversy is in excess of $75,000 not including interest and costs. The party claiming proper jurisdiction must also prove diversity of the  parties. As to the amount in controversy, the Note entered into between the parties is for $35,000 with an 8% interest rate.    Assuming a breach of the Securities Purchase Agreement and the Note, the amount owed on the principle and interest is far below the jurisdictional amount. The Securities Purchase Agreement and Note provide a convoluted and oppressive penalty formula in the event of default. However, those penalties resulting from an alleged default are not part of the calculation for the purpose of determining the amount in  controversy as well as a recent decision in this district that threw out the exact same types of penalties as being unconscionable

---

[1] A true copy of the Amended Complaint, Note and Stock Purchase Agreement are annexed to the Declaration of Mark R. Basile, Esq. filed in support of this motion.

1

and against New York's public policies.

As such, they cannot be included in the calculation for the amount in controversy. Additionally, each of the Note and Stock Purchase Agreement have separate forum selection clauses, however, only the Note's forum selection clause is applicable in this action.

## STATEMENT OF FACTS

### The Parties

According to the Amended Complaint, plaintiff is "a Florida limited liability company." (See Amended Complaint, DKT#18 at ¶1. The Amended Complaint properly alleges that GNID is "a Nevada corporation." (See Id at ¶2).

### The Complaint

Plaintiff alleges that this Court has original jurisdiction pursuant to 28 U.S.C. §1332(a)(2). (See DKT# 18 at ¶3). The Complaint, however, does not identify the citizenship for each of the members of plaintiff sufficiently to establish diversity jurisdiction because it's a generic statement as to citizenship without the necessary detail required by the courts. (Id.). Instead, plaintiff claims in its First Claim for Relief  $150,000 in damages for breach of the SPA, (id. at ¶52); in its Second Claim for Relief $150,000 in damages for breach of the Note, (id. at ¶58) and in its Third Claim for Relief, $150,000.00 in damages for Unjust Enrichment,( id. at ¶62) and in its Fourth Claim for Relief, $150,000.00 in Anticipatory Breach, (id. at ¶68). Notably, portions, if not all of each of the respective claims have been found to violate New York public policy as being an unreasonable and unconscionable penalties and cannot account towards the jurisdictional threshold of $75,000.00, or the actual damage amount is fixed and is well below the required threshold.

2

**The 8% Convertible  Note**

The parties entered into an 8% Convertible Redeemable Note executed on May 24, 2016. (See DKT#18, Ex."B".).  The Note contains several provisions relevant to this motion.

The Principal Amount & Interest

As set forth in the Note, the principal amount of the Note is for $35,000.00. (Id., Ex." B".) The Note states that defendant was to pay back the sum of $35,000.00 and to pay interest on the unpaid principal balance hereof at the rate of eight percent (8%) per annum (the "Interest Rate") from the date of issuance of the Note plus any and all accrued interest is paid in full. (Id. Ex."B".)

The Note further provides that in the event of GNID's failure to pay the interest owed, the Note stated, "Interest shall accrue at a default interest rate of twenty-four (24%) per annum or, if such rate is usurious or not permitted by current law, then at the highest rate of interest permitted by law". Id. The Note also has a forum selection clause stating "this Note shall be governed by and construed in accordance with the laws of New York applicable to contracts made and wholly to be performed within the State of New York and shall be binding upon the successors and assigns of each party hereto. The Holder and the Company hereby mutually waive trial by jury and consent to exclusive jurisdiction and venue in the courts of the State of New York ". (Id. at ¶14.)

Right of Conversion

In addition to repayment by GNID in cash, the Note also provided for a right of conversion into GNID's common stock as an exclusive option of plaintiff.  Paragraph 4 of the Note states that "The Holder of this Note is entitled, at its option, after full cash payment for the shares convertible hereunder, after 180 days from the date of the note, to convert all or any

3

amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock") at a price ("Conversion Price") for each share of Common Stock equal to 65% (a 35% discount) of the lowest trading price. Id.¶4(a).

Calculating The Conversion  Price

Paragraph 4(a) of the Note states that the debt can be converted into common stock "at a price ("Conversion Price") for each share of Common Stock equal to 65% (a 35% discount) of the lowest trading price of the Common Stock as reported on the National Quotations Bureau OTCQB exchange which the Company's shares are traded or any exchange upon which the Common Stock may be traded in the future ("Exchange"), or the twenty prior trading days including the day upon which a Notice of Conversion is received by the Company (provided such Notice of Conversion is delivered by fax or other electronic method of communication to the Company after 4 P.M. Eastern Standard or Daylight Savings Time if the Holder wishes to include the same day closing price)." (Id. Ex. "B" at ¶4(a).) Stated differently, upon conversion, plaintiff was entitled to a 35% discount in the trading price of GNID's Common Stock. In addition to the 35% discount, plaintiff also had the ability to a further reduction in trading price through a look back option.  That option allowed plaintiff the ability to find the lowest trading price in the preceding 20 days of trading from the date of the conversion and convert at 35% of the lowest sale price in that period.

Event Of Default Penalties

 Paragraph 8 of the Note sets forth the purported remedies in the event of default. ¶8(n) includes a default interest rate of 24%; $250.00 per day the shares are not issued, and after the 10th day of failure to issue, $500.00 per day; that outstanding principal will increase by 20% ¶8(n) and 50% ¶8(i);, as well as a "make-whole" provision that utilizes a formula to determine "loss" being Loss=[(high trade price at any time on or after the day of exercise) x

(number of conversion shares)]. (<u>Id.</u>, Ex. "B" at ¶8(n).)

### The Securities Purchase Agreement

On May 24, 2016, the parties also entered into a Securities Purchase Agreement (DKT#18, Ex."A".). In the Securities Purchase Agreement, the parties agreed that GNID "desires to issue and sell to the Purchaser, [plaintiff,] and [GNID as] the Purchaser desires to purchase from the Company a 8% Convertible Note of the Company, in the form attached hereto as Exhibit A, in the principal amount of $35,000.00." <u>Id.</u>, Ex."A" at 1.  The Securities Purchase Agreement further provided that the $35,000 was to be "convertible into shares ("Conversion Shares") of common stock, $0.0001 par value per share (the "Common Stock"), of the Company, upon the terms and subject to the limitations and conditions set forth in such Note." (<u>Id.</u> Ex."A".)

As to the terms, Paragraph 1 of the Securities Purchase Agreement was titled "Purchase and Sale of Note."  It provided that as to the purchase of the Note "[o]n each Closing Date (as defined below), [GNID] shall issue and sell to [plaintiff], and [plaintiff] agrees to purchase from [GNID], such principal amount of Note as is set forth immediately below the buyers name on the signature pages hereto." (<u>Id.</u>, Ex."A" at 1, ¶1.) The signature page reflects the amount as $35,000.00 less $2,000.00 in legal fees. (Id. Ex. "A" at pg. 11.)

Jurisdictionally, The Securities Purchase Agreement also has a forum selection clause that states that  "Any action brought by any party against any other party hereto concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the State and county of New York. (<u>Id.</u>, Ex. A at ¶5(a).)

The Securities Purchase Agreement further states that "[t]he parties to this Agreement

hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non <u>conveniens</u>." Id.

## **LEGAL ARGUMENT**

### **POINT I**

### **THE FEDERAL COURT DOES NOT HAVE ORIGINAL JURISDICTION OVER THIS MATTER**

It is axiomatic that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C §1332. "The burden of proving the jurisdictional amount under 28 U.S.C §1332(a) is upon the party asserting it." *Elfand v. Widman*, 284 F. Supp. 498, 499 (S.D.N.Y. 1968). "Jurisdiction absent jurisdictional amounts cannot be established by waiver or consent." *Crenshaw v. Great Cent. Ins. Co.,* 482 F.2d 1255, 1259 (8th Cir.1973).

"While the court is bound not to dismiss a claim unless it is convinced to a legal certainty that the plaintiff could not recover more than [the jurisdictional amount], it must also appear that the claim was made in good faith and was not merely colorable for purposes of jurisdiction." <u>Id.</u> (citing *Arnold v. Troccoli,* 344 2d 842 (2nd Cir. 1965). To that end, "[l]ack of good faith in making the jurisdictional allegation can exist when from the proofs a court is satisfied to a legal certainty that the plaintiff never was entitled to recover the jurisdictional amount." Id.

Here, because the Note is for $35,000 with an 8% interest rate, plaintiff cannot establish to a legal certainty the jurisdictional amount necessary for this courts jurisdiction. Furthermore, plaintiff has not sufficiently pleaded diversity by failing to identify the citizenship of all of its

members.

###### A.    Plaintiff Cannot Satisfy The Requirement For The Amount in Controversy

Federal Courts have recognized that "where, as here, interest is owed as part of an underlying contractual obligation, unpaid interest becomes part of the principal for jurisdictional purposes." *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457,461 (2d Cir. 1994); see also, *Edwards v. Bates County*, 163 U.S. 269, 272 (1896) (holding that "when the interest evidenced by a coupon has become due and payable the demand based upon the promise contained in such coupon is no longer a mere incident of the principal indebtedness represented by the bond, but becomes really a principal obligation."). That, however, is not the end of the analysis.

<u>The Post-Default Sum Is Not Part Of The Amount In Controversy.</u>

In *Meding v. Receptopharm, Inc*., 462 F. Supp. 2d 348 (E.D.N.Y. 2006), the Court distinguished *Transaero* and identified the limitations of what 'interest' may be included for the purposes of determining the amount in controversy. It held that "[t]o determine whether a claim is fairly characterized as interest, the Court needs to start with the Supreme Court's recognition of interest as an 'accessory' to principal, and then look to the totality of the circumstances of the obligation." Id. at 353. To make that determination, the Court must ascertain whether "the outstanding amount is continually increasing and will cease accruing only when a principal obligation is paid" and if so then "[t]hat would be indicative of 'interest." <u>Id.</u>

"Another factor would be the characterization of the components in the parties' documentation." <u>Id.</u> To that end, the Court held in that case that "it seems clear to me that

7

while the annual pre-maturity interest has become part of the principal obligation, the 10%

default interest has not." Id.  As if speaking directly to plaintiff herein, the Court held:

> "It is one thing to include a component that, although originally
> designated as interest by the parties, has lost all financially
> distinguishing characteristics from the principal obligation. That
> is *Transaero*. It is quite another to include a component that not
> only originates from, but continues to exist as a mere appendage
> resulting from the failure to timely pay a principal Here, all of the
> factors point to classification of the post default obligation as
> interest. It continues to accrue post default. It is characterized as
> interest in the notes, and indeed, stands apart in that respect from
> annual, pre default interest, which is expressly reclassified as
> principal when not paid."

Id. (emphasis added).

The Note in this case is for $35,000 with an 8% interest rate with a Maturity date of

May 24, 2017. In the event of default, the Note set forth a 24% interest rate compounded

daily with a convoluted multiplier that almost doubles the amount owed and added further

penalties for defaulting under the Note. Undisputedly, the original amount and even the 8%

interest rate pre-default at maturity is well below the $75,000 required amount to meet the

jurisdictional requirement. The remaining penalties cannot be considered part of the principal

obligation of GNID under the Note. Another Judge in this district has recently held that the

almost identical daily penalties of $250.00 and $500.00, and "make-whole" provisions were

unconscionable penalties that violate New York's policies, and were thrown out as those

exact claims were dismissed by the court. (See *Union Capital, LLC v. Vape Holdings, Inc*.

No. 16-cv-1343 (S.D.N.Y. Mar. 31, 2017). In addition, the Court in *Meding* recognized those

charges as "a mere appendage resulting from the failure to timely pay a principal obligation."

As such, the amount at issue is limited to the $35,000 principal and the 8% pre-default

interest.

Under New York law a contractually agreed upon sum for liquidated damages will be sustained **only** where (1) actual damages may be difficult to determine, **and** (2) the sum stipulated is not disproportionate to the possible loss. *See In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 142 (2d Cir. 1982); *Bell v. Ebadat*, 2009 WL 1803835, at *2 (S.D.N.Y. June 16, 2009) (Sullivan, J.) (finding liquidated damages provision an unenforceable penalty where actual damages were a fraction of the damages called for by the clause).

Where the damages flowing from a breach of contract are ascertainable, a contractual provision purporting to impose a liability above and beyond those damages is an unenforceable penalty. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (finding contractual penalty of 0.1% of total contract price for each day of delay penal in nature and unenforceable); *N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, 998 F. Supp. 2d 301, 336 (S.D.N.Y. 2014) (finding provision imposing forfeiture of upfront fees in case of a willful breach of contract an unenforceable penalty); *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 568 (S.D.N.Y. 2003) (finding lender's liquidated damages provision imposing monthly penalty for breach of contract unenforceable). In such a case, the contractual remedy— however styled—is disproportionate to the non-breaching party's actual damages. *See 172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 24 N.Y.3d 528, 536, 25 N.E.3d 952, 957 (2014) (finding purported imposition of damages for future rent, in addition to recovery of possession of premises, appears on its face to be a penalty); *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 361 N.E.2d 1015, 1018 (1977) ("A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion. A promisor would be compelled, out of fear of economic devastation, to continue performance and his promisee, in the event of

9

default, would reap a windfall well above actual harm sustained.").

Whether a provision is an unenforceable penalty is a matter of law to be decided by the court. *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) (citing *Vernitron Corp. v. CF 48 Associates*, 104 A.D.2d 409, 409, 478 N.Y.S.2d 933, 934 (2nd Dep't 1984)). "[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of a construction which holds that the provision is a penalty." *Bristol*, 310 F. Supp. 2d at 566; *see also Rattigan*, 739 F. Supp. at 169-70 (quoting *City of New York v. B & M Ferry Co.*, 238 N.Y. 52, 56, 143 N.E. 788 (1924)).

Here, at the time of the Note was entered into, it was not at all difficult to calculate damages for defendant's purported breach. Under New York law, contractual expectation damages for the non-delivery of publicly traded shares are measured as of the date of the alleged breach. *See Lucente v. International Business Machines Corp.*, 310 F.3d 243, 262 (2002) (finding "[t]here is simply no reason why, assuming a jury finds [defendant] liable for breach of contract, money damages would not adequately compensate [plaintiff] for [defendant's] breach"); *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir.1990) ("The damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach."); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 301 (S.D.N.Y. 2010). Thus, under the law, there is no need to engage in speculation concerning what plaintiff might have done if it had received the conversion shares, or to be concerned about fluctuations in the price of the shares, because the law mandates a calculation of the damages on a single, specific date.   Once the Court determines the date of the breach,

the damages can be easily established.

To the extent that the Note is enforceable, defendant submits that the date of the breach is November 28 2016, the date on which defendant refused to honor the conversion notice. Defendant's public shares high price was, and closed at $0.02 per share on November 28, 2016. (See Decl. of Mark R. Basile, Ex. 4). Accordingly, on the date of the breach, in accord with the Note's terms, $5,000.00 in conversions would yield 439,560 shares with the 35% discount for which plaintiff now claims damages, were worth ***$8,791.29***—or only ***5.85%*** of the egregious *$150,000.00* that plaintiff seeks in this action. In a recent decision in the U.S. District Court for the Eastern District of New York, J. Garaufis held that the amount of the plaintiff's claims for meeting diversity jurisdiction in Federal Court would include the actual value of the stock subject to conversion, plus the accelerated principle. (*See LG Capital Funding, LLC v PositiveID Corporation, Index No. 1:17-cv-1297*, U.S.D.C., E.D.N.Y. DKT# 21, Order denying LG a Preliminary Injunction).

It is clear that the formula in the Damages Penalty Provision was not a fair attempt to estimate in advance plaintiff's actual damages under New York law because it intentionally departs from the measurement of plaintiff's actual loss on the date of the breach and purports instead to award plaintiff damages based upon an unfixed, and constantly shifting "high trade price at any time on or after the day of exercise," at plaintiff's choosing. Indeed, under the literal terms of the Note, plaintiff could continue to increase its claim repeatedly in the event that defendant's stock price climbed during the pendency of this litigation.

**B.**    **The Maximum Actual Damages is below the Diversity Threshold.**

Here, the amount in controversy is  $35,000.00 plus the 8% interest rate, assuming that the Note and Stock Purchase Agreements are even enforceable. Regardless, the $35,000.00 principal with the 8% interest rate is not enough to meet the statutory

requirements to establish and maintain original jurisdiction.  At worst, should this court

conclude that the 24% default interest rate, without more, is applicable, the total amount in

controversy is still only $35,000.00 plus 8% interest from May 24, 2016 to November 28,

2016 totaling $1,400.00, plus 24% interest from November 28, 2016 to present, totaling

$4,368.00, bringing plaintiff's total claim to only $40,768.00, far below the statutes

jurisdictional threshold. Even if the court then adds the potential actual loss of $8,791.29 from

defendant failing to honor the stock conversion request, that would only bring plaintiff's total

claim to $49,559.29, still well below the $75,000.00 required jurisdictional threshold. (See

id.). "A party invoking the jurisdiction of the federal court has the burden of proving that it

appears to be a 'reasonable probability' that the claim is in excess of the statutory

jurisdictional amount", *Tongkook Am., Inc. v Shipton Sportwear Co.,* 14 F. 3d 781 (2d. Cir.

1994). Here, plaintiff fails to meet the 'reasonable probability' test.

### C.        Plaintiff Has Failed To Plead Diversity of Citizenship

Federal Courts require "the requisite complete diversity among defendants and

plaintiffs" for the purposes of diversity jurisdiction. *Lenz v. Associated Inns & Restaurants Co.

of Am.,* 833 F. Supp. 362, 377 (S.D.N.Y. 1993). Here, "the partnership is a named plaintiff and,

for diversity purposes, the citizenship of a limited partnership is the citizenship of each of its

partners, both general and limited."  Id.

The Supreme Court has rejected "the contention that to determine, for diversity

purposes, the citizenship of an artificial entity, the court may consult the citizenship of less

than all of the entity's members." *Carden v. Arkoma Associates*, 494 U.S. 185, 195-96 (1990).

In requiring identification of all the members, the Supreme Court held that "[w]e adhere to

our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the

12

citizenship of all the members, the several persons composing such association, [and] each of its members." Id.

GNID is a Nevada corporation.  Plaintiff is a Florida limited liability Company. As a limited liability company, plaintiff is required to identify all of its members for the purposes of establishing diversity jurisdiction. Its amended complaint, however, fails to identify any of its limited members for the purposes of establishing diversity jurisdiction. (See DKT #18, Amended Cmplt. at  ¶1.) As it is plaintiff's burden to establish diversity jurisdiction for its state law claims, plaintiff must identify the citizenship for each of its limited members. Having failed to do so, plaintiff has yet to establish diversity jurisdiction.

## POINT II

## CONFLICTING FORUM SELECTION CLAUSES
## VENUE IS IMPROPER IN FEDERAL COURT

### D. The Forum Selection Clause in the Note controls the issues of Jurisdiction and Venue.

This Court must grant defendant's motion to dismiss on the grounds that venue is improper because the language contained in the note expressly sets venue in the courts of the State of New York notwithstanding the forum selection clause in the Stock Purchase Agreement. In *Madden v. Midland Funding*, LLC, No. 11-CV-8149 (CS), 2017 U.S. Dist. 27109 (S.D.N.Y. Feb. 27, 2017),  J. Seibel  stated that "As a federal court applying state law, [I am] generally obliged to follow the state law decisions of state intermediate appellate courts. Id. at 11 (noted that J. Seibel in her judgment relied on the decisions of the *state* intermediate appellate courts). See also *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 61 S. Ct. 179 (1940).  (held that state law is applied in the federal as well as the state courts and it is the duty of the federal courts in every case to find state law and apply it rather than to prescribe a different rule, however much the

state rule may depart from prior decisions of the federal courts). Id. at 181. While plaintiff is essentially arguing that the enforcement of a forum selection clauses is a procedural issue and thus federal law should apply in its interpretation, they have ignored well-established principles of our legal system.  In *West*, it was recognized that there are many rules of decision that are acted upon by inferior courts which ultimately becomes state law even if it has not been before the highest court of the state.  (held that in these circumstances federal courts are not permitted to ignore state's rules even if it believes there is a better, applicable principle) Id. at 183

It is a generally accepted rule in contract law that where language such as, "of" a certain state is employed, it is an indication of sovereignty, not geography.  In other words, the forum selection clause found in Para.14 of the Note is exclusive, limiting actions arising out of this instrument to State Courts of New York.  While this court is in the State of New York geographically, it is not a New York State court.  *See Sahara Sam's Oasis, LLC v. Adams Cos.,* Civil Action No. 10-0881 (RMB/AMD), 2010 U.S. Dist. 82034 (D.N.J. Aug. 12, 2010)*.*  (held that suit was to be brought exclusively in the county of Tulsa since no other alternative interpretation can be formulated).  In *Sahara Sam's Oasis, LLC*, the language employed was "will not bring suit…in any court other than those of Tulsa County, Oklahoma…" Id. at 15. The court in that case properly interpreted the language to confer exclusive jurisdiction in Oklahoma state courts.  (held that "of" a certain state or county, is a marker of sovereignty rather than geography, and therefore only state courts are implicated) Id. at 19

Generally, when an ambiguity exists in the forum selection clauses, the courts have interpreted the ambiguity against the drafter.  *See Unity Creations, Inc. v. Trafcon Indus.,* 137 F. Supp. 2d 108 (E.D.N.Y. 2001) (held that there is a distinction between language purporting to identify jurisdictions versus venue of the action).  The plaintiff is asking this court to enforce the forum selection clause of the Stock Purchase Agreement that contains the contradicting term,

14

"…. or in the federal courts located in the state and county of New York."  In these situations the court must avoid any interpretation that renders a provision of either agreement superfluous. *See Hester v. Navigators Ins. Co.,* 917 F. Supp. 2d 290 (S.D.N.Y. 2013) (held that terms rendering obligations contained in insurance policy "mere surplusage" is an unacceptable result under New York Law).

Plaintiff no doubt will rely on the recent holding in *Union Capital LLC v. Vape Holdings Inc*, No. 16-cv-1343 (RJS), 2016 U.S. Dist. 72973 (S.D.N.Y. Mar. 8, 2016).  In that case, Judge Sullivan attempted to reconcile the language between the two contract's forum selection clauses by interpreting the clause in the Stock Purchase Agreement as defining the language "in the Courts of the State of New York" in the Note as also meaning the Federal courts in New York. While J. Sullivan recognized that courts have taken the exact same language and construed it to mean at the exclusion of federal courts, he nonetheless used the outlier term in the Stock Purchase Agreement to interpret the meaning of the clause in the Note even though the forum selection clause in the stock purchase agreement also provided for proper venue in New York State courts, as it does here.

Defendant agrees with the analysis applied but believes the ultimate conclusion was in error.  The Note and SPA in our case should be read to give effect to *all* its provisions and to render them *consistent* with each other.  See *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 53, 115 S. Ct. 1212, 1214 (1995).  In *Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.*, 106 A.D.2d 242, 243, 485 N.Y.S.2d 65, 66 (App. Div. 1985), a similar holding supports the rule of law mentioned in *Mastrobuono*.  (held that a contract should be construed so as to give force and effect to all of its provisions).  Generally, if the forum selection clause employs mandatory language such as "shall," "only," or "exclusive," specifying jurisdiction, then it will be enforced as a mandatory forum selection clause.  *Caperton v. A.T. Massey Coal Co.*, 225 W.

15

Va. 128, 132, 690 S.E.2d 322, 328 (2009). On the other hand, if jurisdictional language exists but no further words of exclusivity are supplied then it will be treated as a permissive forum selection clause. Id. However, the two competing forum selection clauses in our case actually both employ mandatory language such as "shall, exclusive, and only." Thus, defendant is arguing that instead of using the outlier term contained in the SPA, the court should instead give force to all the provisions contained in both forum selection clauses. Under New York's choice-of-law rules, the law of different jurisdictions can apply to the contract claims and the tort claims in a given action. Official Comm. of *Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 77 (Bankr. S.D.N.Y. 2001). Similar reasoning should be applied here where plaintiff's claims solely arise from the provisions in the note and the intention of both parties regarding disputes related to the note are expressly manifested in their own individual forum selection clauses. *See Smith v. Shields Sales Corp.*, 2005 NY Slip Op 7775, 22 A.D.3d 942, 802 N.Y.S.2d 764 (App. Div.) (held that the express, distinct language in the various documents indicating different avenues of relief demonstrates that the parties intended that the remedy would differ depending on which document was at issue). Just as in *Smith*, this court should follow the same reasoning because, in our case, plaintiff is claiming that the forum selection clause contained in the SPA applies to all disputes arising out of both documents. That simply is not the case and would render the forum selection clause in the note inoperative in any claim related to the transaction. Instead the court should interpret the forum selection clauses in both documents to be invoked dependent on which document the claim is arising from. So, in the event of a claim that invokes an issue of a federal question dealing directly with the nature of the stock, such as a violation of the SEC's Act of 1933, then the "…or in federal courts located in the state and county of New York," provision

16

would become applicable, and that would arise from the Stock Purchase Agreement, and not the Note.

J. Sullivan used three factors in *Union* to make his determination; that the two instruments were executed at the same time; involved the same parties, and served the same purpose. Our analysis only differs with regard to the final prong of J. Sullivan's analysis. Defendant's Note and the SPA do not serve the same purpose. This is evident by the fact that in the case of a breach that constitutes an "event of default" as stated in Para.8 of the note plaintiff can fully seek the appropriate, agreed to remedies without the provisions in the SPA. See DKT #18, Ex. B at ¶8. In *Union Capital LLC*, the court concluded that the SPA's purpose was to effectuate Vape's sale of a convertible note to plaintiff. That is however not the purpose of the SPA in this case. The plaintiff does not have to resort to any provision in the SPA to effectuate the sale, conversion, nor any event of default related to the convertible Note. In fact, it's a loan that stands separate from the SPA. Aligned with J. Sullivan's analysis, plaintiff should not be able to invoke a provision of a separate written instrument that does not serve the same purpose as the Note.

It should also be noted that while the nomenclature utilized to characterize the issuance of the Note "as a sale under the SPA," the state courts have held they are loans until converted into stock, and that until such time, the conversion feature is just an option under the Note until invoked by the lender. See *LG Capital Funding, LLC v. Sanomedics Intl. Holdings, Inc.*, 2015 NY Slip Op 32232(U) (Sup. Ct.) (held that plaintiff, is entitled, at its *option* to convert outstanding value of note into common stock). Justice Demarest in that case noted in her opinion that, "Although the initial transactions were loans, ............., the Securities Purchase Agreement provided that, upon conversion, SIH was selling securities under Note 1 to it as an *investor*. The conversion to stock would convert plaintiff from a lender to an investor with the

17

right [*30] to share in the profits and losses of SIH." Id.at ¶¶ 24-25. Similarly in our case, plaintiff is claiming a breach of §4(a) of the note that simply "entitles" plaintiff to exercise an option to purchase discounted shares, ultimately subject to market conditions.  See DKT #18, Ex. B at ¶4(a). In *Vape*, J. Sullivan also believed that the conversion feature of the note was simply an "option" since the plaintiff could have requested a cash payment but instead chose the option that is subject to changing market conditions.  Again, our case is no different; §4(e) of the note in our case states a cash reimbursement option in the event of any "Sale Event" in connection with a note that was not *redeemed* or converted. Id. at ¶4(e). Plaintiff's contention that its claim is arising out the SPA is disingenuous because plaintiff has not established itself in a position to invoke either the protection of the note or SPA.  Plaintiff has the ability to redeem their outstanding notes for cash but instead elected to convert a portion of its note to stock under the terms of the Note itself. Additionally, plaintiff may not assert a valid cause of action under §4(e) of the Note until the shares of common stock have been issued, which would change plaintiff's status to an "investor."

This very court decided in *Celerant Tech. Corp. v. Overland Sheepskin Co.*, 2007 U.S. Dist. 8851 (S.D.N.Y. Jan. 29, 2007), that language such as "in the courts of the State of New York in New York County" did not include the U.S. S.D.N.Y. (noted that plaintiff attempted to distinguish the line of cases that specifically stated the venue such as "The New York Supreme Court" but the court was not moved at all and granted motion to remand).  Opposing counsel may argue that the inclusion of the word "federal" is enough to confer specific jurisdiction, but the court should rule as they did in *Celerant* for the sake of uniformity in future cases of similar subject matter.  This court has decided in *Celerant* that the defendant's argument of not including the language "N.Y. Supreme Court" as grounds for removal was meritless and this

ruling should be applied the same way in this case if specificity of the forum selection clause in the Note is raised as an issue.

**E.      The Test in New York for proper Venue is the 'Claims Arisen From' Test.**

Plaintiff's amended complaint alleges that defendant breached five terms from the Note and the Stock Purchase Agreement.  However, only one out of the five allegations in the amended complaint is derived from the Stock Purchase Agreement.  ¶28 of the amended complaint claims that defendant is in breach of section 3(c) of the Stock Purchase Agreement, which deals with the issuance of the shares.  See DKT #18 at ¶28. Generally, two separate instruments executed within a reasonable period of time from each other may be construed together and for the purpose of ascertaining what they mean may be read together as if a single agreement.  *See Kent v. Universal Film Mfg. Co.,* 200 A.D. 539, 193 N.Y.S. 838 (App. Div. 1922) (held that the general rule should not be misconstrued to mean two separate written instruments must be consolidated or that a separate independent provision of one, which has no bearing on the construction of the two instruments is deemed incorporated in the other).

The notion of viewing the documents separately has been discussed before in *Knowles v. Toone*, 96 N.Y. 534 (1884) and is determinative to our case as well.  In *Knowles*, the court held that the letter was indeed part of the contract due to the fact that both the letter and the note had to be in possession of the holder before the contract even came into being.  In other words, the receipt of the letter was a condition precedent that must be met in order for the holder to purchase the note and loan the money. However, in our case there is no such condition precedent that needs to be satisfied in order for the note to take effect.  The Note and SPA should not be

19

viewed as a single contract, as in *Knowles* because the SPA in our case has no bearing on the construction of the Note.  The Note is meant to stand-alone and its provisions are fully capable of being enforced without reference to the SPA.  Plaintiff does not require the terms set out in the SPA in order to receive its agreed to shares of the company's common stock.  Even if this court was to entertain plaintiff's contention that the SPA should be viewed as a single written instrument with the Note, it is undisputed that the condition precedent for conversion of the Note is the submission of the "Notice to Conversion" under the Note, not the SPA itself.  See DKT #18, Ex. C, Para. 4 (a) of the Note sets out in detail the necessary actions plaintiff must take to redeem the Note, which is the premise of default and all of plaintiffs claims are founded upon. See DKT #18, Ex. B at ¶4(a).

Defendant does not argue that upon submission of the notice to convert, the shares were not issued to plaintiff.  Defendant is asking this court to let a State Court of NY to hear the dispute as set out in the forum selection clause of the note, since plaintiff's cause of action stems from that specific document.  This case is almost factually analogous to the *Kent* case in that, the Stock Purchase Agreement's competing forum selection clause is irrelevant to our case at hand.  In *Kent*, Exhibit D comprised of the agreement that plaintiff would assign his remainder interest to defendant and it also contained the jurisdictional clause in question; simultaneously Exhibit E was also executed.  Exhibit E simply referred to Exhibit D, in that the assignment was not to affect plaintiff's rights set out in the original agreement (Ex. A).  In other words, the earlier formed original agreement embodied in Exhibit A was still to be valid and the terms set out in the original agreement were basically "recited" in Exhibit E serving as a "confirmation" of the parties intent to continue their obligations as joint lessees even though defendant owned entire interest. In *Teletech Europe B.V. v Essar Servs. Mauritius*, 2011 Slip Op 02957 (83 AD 3d 511), the court noted on Appeal that the "Supreme Court correctly noted that, for purposes of

20

interpreting contemporaneous agreements which are part of the same transaction, the instruments should be read together (*see Nau v Vulcan Rail & Const. Co., 286 NY 188, 197 [1941]).* However, it does not follow that the arbitration clause in the STA applies to this dispute. Indeed, we find that it is the escrow agreement, not the STA, that contains the conditions precedent for release of the escrow funds.*"*

In this case, the Stock Purchase Agreement is nothing more than a recitation of the terms set out in the note.  The "Notice of Conversion" condition precedent is derived from the Note itself, not the SPA.  See DKT#18, Ex "B" at ¶4(a). Even the claim from plaintiff alleging breach of section 3(c) of the Stock Purchase Agreement is a recital of the terms set out in the note, specifically, §6, §12, and §8(h)(n).  See DKT #18, Ex. B at ¶6, ¶¶8(h),(n), ¶12 Section 3(c) recites the requirement from defendant to validly issue shares upon conversion, maintain share reserve requirement, shares be fully paid for free from liens, and that plaintiff can not incur personal liability upon holder there of in respect to other shareholders.  See DKT # 18, Ex. A at ¶3(c). Plaintiff has mistakenly drafted its complaint claiming these violations stem from the Stock Purchase Agreement.  This would be true if both instruments were viewed as an integrated, consolidated writing but defendant is contending that regardless of the issue of integration, the claims all arise from the note and thus the forum selection clause conferring jurisdiction and venue exclusively to state courts should prevail.

In *Kent*, the object of Exhibit E is "… to explain the terms and conditions of the assignment."  Just as in our case the Stock Purchase Agreement is identically drafted to further explain the terms and conditions of the Note pertaining to the plaintiff's rights and obligations upon conversion into stock.

In *CooperVision, Inc. v. Intek Integration Tech., Inc.*, 2005 NY Slip Op 25060, 7 Misc. 3d 592, 794 N.Y.S.2d 812 (Sup. Ct.), the defendant was claiming that a forum selection clause found in one of the documents was "incorporated by reference" into the entire agreement.  (held that reference to the agreement containing the forum selection clause absent an express provision making the forum selection clause applicable to desired instrument, clearly demonstrated that parties intended clause to only apply where found).  Our case is similar in that the SPA is merely a confirmation of the over-arching or master agreement that is the note.  §5(e) of the SPA, serves the same purpose as the "entirety of agreement provision" found in the integration agreement in *CooperVision*. (held that reference to the agreement containing forum selection clause was only for the purpose of identifying it as one of the documents that comprised the overall agreement of the parties) (also noted that a reference by the parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified).  See DKT # 18, Ex. A at ¶5(e). §3(c) of the SPA which plaintiff's claim is based on references the to Note, which is an extraneous writing with regard to the SPA itself, and applying the same analysis from *CooperVision* the court must only assess the purpose of its mention (the note) in the context of the SPA.  This court must ask what was the particular purpose of referencing the note in §3(c) of the SPA? §3(c) is explicitly stating the particular purpose of the note in the SPA which is to make clear that issues related to the conversion of the note is to be settled in accordance with the terms set out in the Note. The SPA in this case is nothing more than a document that effects the nature of the stock under an "option" that is exercised in the context of an outstanding debt evidenced by the Note, regardless of what the documents purport to say. Without the

defendants underlying obligations under the Note, the plaintiff could never convert the debt

into shares and would require the plaintiff to have purchased the shares directly from the

defendant at the start of this transaction in order to be an "investor". Thus, defendant's

contention that the forum selection clause of the Note should prevail is sound.


## **CONCLUSION**

For the foregoing reasons set forth above, Defendant GeneSYS ID, Inc., requests that

the Court grant its motion to dismiss the amended complaint for lack of jurisdiction pursuant

to 28 U.S.C §1332, or alternatively, to dismiss the amended complaint pursuant to FRCP

12(b)(1) and 12(b)(3) for lack of jurisdiction and lack of venue, as well as awarding

defendants legal fees and costs.

Respectfully submitted,

**THE BASILE LAW FIRM, P.C.**
*Attorneys for Defendant*
68 S. Service Rd., Ste. 100
Melville, New York 11747
Tel. 516.455.1500
Fax. 631.498.0478
mark@thebasilelawfirm.com


**By:**   /s/Mark R. Basile
         Mark R. Basile, Esq.
         Juris. (MB2201)

23