UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAR BAYS, LLC, **Plaintiff,** -against- GENESYS ID, INC., **Defendant.** | 17-cv-01175 (ALC) <u>OPINION AND ORDER</u> |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Adar Bays, LLC ("AB") brings this action alleging breach of a Securities Purchase Agreement ("SPA") providing for the purchase and issuance of two Convertible Redeemable Notes ("Notes"). Plaintiff seeks summary judgment on its claims. Defendant GeneSYS ID, Inc. ("GNID") contends that the Notes are void as usurious, and accordingly moves to dismiss the complaint on usury grounds. For the following reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion to dismiss is DENIED.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the parties' Rule 56.1 statements. Facts are agreed upon unless otherwise noted.

AB is a limited liability company based in Florida. Rule 56.1 Statement of Material Facts ¶ 1 (ECF No. 52) ("SMF"). GNID is a corporation based in Nevada whose shares are publicly traded on the Over-The-Counter ("OTC") Market. *Id.* ¶¶ 2-3.[1]

---

[1] GNID was previously known as RX Safes, Inc. *Id.* ¶ 4. For purposes of clarity, it is referred to as GNID throughout this opinion.

On May 24, 2016, AB and GNID entered into an SPA. *Id.* ¶ 5; *see* Declaration of Aryeh Goldstein ("Goldstein Decl") Ex. A (ECF No. 53-1) ("SPA"). AB contends that the SPA provided for, *inter alia*, the purchase and issuance of a $35,000 8% Convertible Redeemable Note. *Id.* ¶ 7. GNID disputes this characterization, and contends that GNID borrowed $35,000 and executed a promissory Note reflecting the same. Response to SMF ¶ 7 (ECF No. 58) ("RSMF").

### A. Terms of the SPA and Note

The Note stated that GNID promised to pay AB the aggregate principal amount of $35,000 on the Maturity Date, May 24, 2017, and to pay interest on the principal outstanding at the rate of 8% per annum, commencing on May 24, 2016. *Id.* ¶¶ 11-12; Goldstein Decl Ex. B (ECF No. 53-2) ("Note"). As detailed below, GNID contends that the effective interest rate on the Note was actually significantly higher than 8%, and accordingly the Note is usurious. *See generally* RSMF.

The Note provides that AB is entitled, at any time after 180 days from Note issuance, to convert any or all of the outstanding balance of the Note into shares of GNID's common stock ("Common Stock") at a price ("Conversion Price"). *Id.* ¶¶ 22-23; *see* Note § 4(a). The Conversion Price would be 65% of the lowest trading price of the Common Stock on the OTC Market for the twenty prior trading days. *Id.* ¶ 24; *see* Note § 4(a). AB was required to submit a Notice of Conversion prior to exercising this right. *Id.* ¶ 25; *see* Note § 4(a). Then, GNID was required to effectuate the conversion by delivering the shares of Common Stock within three business days of receipt of the Notice of Conversion. *Id.* ¶ 27; *see* Note § 4(a). AB contends that the conversion right is a material term of the Note. *Id.* ¶ 29.

The SPA states that GNID would authorize and reserve shares for the purposes of conversion. *Id.* ¶ 31; *see* SPA § 3(c). Under the Note, GNID would initially issue irrevocable transfer agent instructions reserving 278,000 shares of Common Stock for the purposes of conversion ("Share Reserve"). *Id.* ¶ 32; *see* Note § 12. The Note further required GNID to "reserve a minimum of three times the amount of shares required if the note would be fully converted." *Id.* ¶ 34; *see* Note § 12. It also allowed AB to "reasonably request increases from time to time to reserve such amounts." *Id.* ¶ 35; *see* Note § 12.

The Note provides for several "Events of Default." *Id.* ¶ 47; *See* Note § 8. Under § 8(k), failure to deliver converted stock within three business days triggers default. *Id.* ¶ 48; *see* Note § 8(k). Section 8(b) states that default will occur if any "representations or warranties made by [GNID]" in connection with the Note or SPA "shall be false or misleading in any respect." *Id.* ¶ 52; *see* Note § 8(b). Further, § 8(c) provides for default if GNID fails to perform or observe "any covenant, term, provision, condition, agreement, or obligation" under the Note. *Id.* ¶ 56; *see* Note § 8(c). The Note states that upon default, interest would accrue at 24% per annum, or – if usurious or otherwise not permitted by law – at the highest rate permitted by law. *Id.* ¶ 74; Note § 8.

The Note provides for two alternative remedies if GNID breaches by failing to deliver shares. *Id.* ¶ 64; *see* Note § 8. First, liquidated damages would accrue in the amount of $250 per day beginning on the fourth day after the Notice of Conversion was delivered, and increase to $500 per day beginning on the tenth day. *Id.* ¶ 65; *see* Note § 8. Second, the "Make-Whole for Failure to Deliver Loss" provision allows AB to provide GNID with written notice of the amounts payable, and requires GNID to make it whole as follows: Failure to Deliver Loss = [(High trade price at any time on or after the day of exercise) x (Number of conversion shares)].

*Id.* ¶¶ 69-70; *see* Note § 8. Additionally, the Note provides that GNID will pay reasonable attorneys' fees, costs, and expenses. *Id.* ¶¶ 80-81; *see* Note §§ 7, 8. Finally, the Note provides that if any section is held to be invalid or unenforceable, it "shall be adjusted rather than voided, if possible." *Id.* ¶ 82; *see* Note § 9.

Terms of the Note were reflected in GNID's Quarterly Statement for the period ending on September 30, 2016. *Id.* ¶ 13; *see also* Goldstein Decl Ex. C ("ECF No. 53-3") ("10-Q").

## B. Performance

On May 24, 2016, GNID issued a Disbursement Memorandum that directed AB to disburse (1) $2,000 to New Venture Attorneys, P.C. and (2) $33,000 to GNID, in conjunction with the funding of the Note. *Id.* ¶¶ 15-17; *see* Goldstein Decl Ex. D (ECF No. 53-4) ("Disbursement Memo"). On May 26, 2016, AB wired the requisite funds per the instructions in the Disbursement Memo. *Id.* ¶ 20; *see* Goldstein Decl Ex. E (ECF No. 53-5).

AB thus contends that the Note was fully funded. GNID, however, maintains that only $33,000 was funded, since $2,000—6% of the loan amount—was disbursed to AB's attorneys. Counterstatement to Statement of Material Facts ¶¶ 1-2 (ECF No. 58) ("CSF").

## C. Failure to Honor Notice of Conversion

On November 28, 2016, AB submitted a Notice of Conversion to GNID for $5,000 of the Note to be converted into 439,560 shares of GNID Common Stock at $.011375 per share. SMF ¶¶ 36-38; *see* Goldstein Decl Exs. F, G (ECF Nos. 53-6, 53-7). The following day Lorraine Yarde, GNID's Chief Executive Officer ("CEO"), acknowledged receipt of the Notice of Conversion but stated that GNID would not be honoring it. *Id.* ¶ 39; *see* Goldstein Decl. Ex. H (ECF No. 53-8). GNID did not deliver the shares. *Id.* ¶ 40.

GNID's 10-Q for the period ending September 30, 2016 stated that the company "terminated it transfer agent on September 6, 2016, preventing further toxic conversions and bringing all parties to the table to discuss a satisfactory settlement . . . ." *Id.* ¶ 41; *see* 10-Q at 36.

Around December 15, 2016, AB emailed a Default Notice to Yarde. *Id.* ¶ 42; *see* Goldstien Decl. Ex. I (ECF No. 53-9). The Notice reiterated the terms of the Note and SPA, stated that GNID breached the Note by failing to tender the requested shares, and demanded immediate delivery of the requested shares. *Id.* ¶¶ 42-45.

To date, GNID has not delivered the requested shares. *Id.* ¶ 46.

AB alleges that GNID has breached the following provisions of the Note: § 8(k), by failing to deliver the requested shares of Converted Stock; § 8(b), by breaching its representations that it would deliver the requested shares, maintain a share reserve, and repay the Note upon maturity; and § 12, by terminating its relationship with its transfer agent. *Id.* ¶¶ 48-49, 52-55, 59, 61. It further alleges that GNID breached Section 3(c) of the SPA by failing to deliver the requested shares and terminating the transfer agent. *Id.* ¶¶ 50-51, 59, 60.

AB contends that as a result of this breach, GNID is in default and owes payments at the default interest rate as well as damages as provided for in the Note. GNID contends that the Note is void *ab initio* as usurious.

## II. Procedural Background

AB filed the complaint commencing this action on February 16, 2017. ECF No. 1. AB filed an amended complaint on April 19, 2017, bringing claims for breach of the SPA, breach of the Note, unjust enrichment, anticipatory breach of the Note and SPA, and costs, expenses, and attorneys' fees. ECF No. 18 ("FAC"). That is the operative complaint in this motion.

On January 16, 2018, GNID moved to dismiss this action pursuant to Fed. R. Civ. P. 12(c) on the grounds that the Note is void as usurious. ECF No. 48 (Def Mem). Also that day, AB moved for summary judgment under Fed. R. Civ. P. 56 on all counts. ECF No. 54 ("Pl Mem"). The parties filed their respective opposition motions on February 13 and 14, 2018. ECF No. 55 ("Pl Opp"); ECF No. 59 ("Def Opp"). On February 27, 2018, both parties filed their respective reply briefs. ECF No. 60 ("Def Reply"); ECF No. 61 ("Pl Reply"). Accordingly, the Court considers the motions fully submitted.

## DISCUSSION

### *Motion for Summary Judgment*

## I.  Legal Standard

Summary judgment is appropriate if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. Rule 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Then, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The party opposing summary judgment "may not rely on mere speculation or conjecture" as "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

Factual disputes that are "irrelevant" or "unnecessary" are insufficient; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" can defeat a motion for summary judgment. *Anderson*, 477 U.S. at 248.

In making this determination, the Court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Application

### A. Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff must adduce "proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2010) (citations omitted). Summary judgment on a breach of contract claim "is appropriate if the terms of the contract are unambiguous." *Id.* (citation omitted). In order to prevail at the summary judgment stage, "it must be clear at the outset that there are no genuine issues of material fact that either [the party] did not breach an agreement, or if it did, that its breach does not rise to the appropriate level of materiality to justify termination of the agreement." *Drapkin v. Mafco Consol. Group, Inc.*, 818 F. Supp. 2d 678, 685-86 (S.D.N.Y. 2011) (citation omitted).

#### i. Existence of an Agreement

GNID does not dispute the existence of the SPA and Note. However, it contends that material issues of fact as to the terms of these agreements remain. Essentially, GNID contends that the fact that the Note had an 8% interest rate is "disputed" because (1) the $2,000 payment to AB's attorney should be considered 6% "hidden interest"; (2) since the cash repayment option was only available for the first 180 days, the actual interest rate prior to conversion was 28%; (3)

the discounted stock created an interest rate of at least 35%; and (4) the stock reservation represented a 400% interest rate. Def Opp at 8.[2]

As AB argues, these disputes relate to legal conclusions, not actual facts. GNID does not deny, for instance, that $2,000 was applied to attorneys' fees—it merely seeks to characterize them as part of the interest rate for the purposes of its legal argument. This is insufficient to raise a material issue of fact on a summary judgment motion. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (to the extent affidavits "contain[ed] bald assertions and legal conclusions . . . the district court properly refused to rely on them"); *Ying Jing Gan v. City of N.Y.*, 996 F. 2d 522, 532 (2d Cir. 1993) (nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

### ii. Adequate Performance

AB performed by wiring the aggregate $35,000 pursuant to the Note. *See* Goldstein Decl Exs. D, E. GNID denies that it accepted those funds because "the note is criminally usurious." RSMF ¶ 21. However, GNID does not offer any evidence for that assertion. Its argument that the Note is usurious has no bearing on whether AB performed under it. *See Ying Jing*, 996 F. 2d at 532. It is thus undisputed that AB performed under the agreement.

### iii. Breach

AB contends that GNID breached the agreement by (1) failing to honor AB's Notice of Conversion and (2) terminating its transfer agent.

---

[2] Specifically, GNID raises twenty-two objections to AB's Rule 56.1 statement. *See* RSMF ¶ 7 (disputing that SPA provided for "purchase and issuance of a $35,000.00 8% Convertible Redeemable Note" because "Defendant borrowed $35,000.00 and executed a Promissory Note reflecting the same"); ¶ 9 (same); ¶ 11 (same and noting that "the amount funded was $33,000.00 as $2,000 was applied to plaintiff's alleged attorney's fees"); ¶ 30 (denying that failure to honor conversion feature of Note deprives AB of a benefit for which it negotiated and purchased the Note because conversion was a form of repayment of the Note only); ¶¶ 21. 53, 54, 60-63, 67-79 (denying various facts because the note is void *ab initio* as criminally usurious).

GNID does not dispute these facts. As discussed below, GNID merely contends that it did not need to comply with the agreement because the Note is usurious. This is a legal, not factual, dispute and thus does not preclude summary judgment. *See Schwapp*, 118 F.3d at 111. Moreover, for the reasons discussed below GNID's usury claim is without merit.

Accordingly, the Court concludes that GNID breached the agreement.

### iv. Damages

AB contends that it incurred significant damages as a result of this breach. It argues that, had GNID honored the conversion, it would have been free to sell the shares on the open market at a profit, and to convert further portions of the Note if the market remained favorable.

GNID yet again does not contest this assertion, but argues that the Note's interest rate is usurious and thus damages are unwarranted. There thus is no factual dispute that AB was damaged. The question is the amount of those damages.

### 1. Liquidated Damages

AB seeks to enforce a liquidated damages clause providing for $250 per day beginning on the fourth day after the Notice of Conversion was delivered, and escalating to $500 per day following the tenth day. Here, AB contends, this results in $204,000 in damages as of the filing of its summary judgment motion. Goldstein Decl ¶¶ 45-46. In addition, AB contends that it is entitled to repayment of the remaining $30,000 of principal, as well as regular and default interest accrued thereupon. *Id.* ¶ 50. Combined with the 24% default interest rate, that sum would amount to $39,690.47. *Id.* ¶¶ 51-52.

GNID makes no argument that the liquidated damages clause here is an unenforceable penalty. Nevertheless, the Court addresses this issue. "[A] liquidated damage[s] provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the

injury that would be sustained as a result of a breach of the agreement." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 416 (S.D.N.Y. 2016) (citations and internal quotation marks omitted). Where a liquidated damages provision "does not serve the purpose of reasonably measuring the anticipated harm," and is instead "punitive in nature," it "will not be enforced." *Id.* at 417 (citation omitted). In determining whether a clause is a valid liquidated damages provision or an unenforceable penalty, courts "look to substance and not to form." *Id.* (citation and internal quotation marks omitted).

Accordingly, "courts will uphold and enforce liquidated damages provisions where (1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss." *LG Capital Funding, LLC v. 5Barz Int'l, Inc.*, 307 F. Supp. 3d 84, 101 (E.D.N.Y. 2018) (citation and internal quotation marks omitted). If the provision "does not satisfy one or both of these factors, the liquidated damages provision will be deemed an unenforceable penalty." *Id.* "In other words, '[i]f such a clause is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced.'" *Union Capital LLC v. Vape Holdings, Inc.*, No. 16-cv-1343, 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) (quoting *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990)).

Here, the clause is an unenforceable penalty. Two courts recently considered and rejected nearly identical "liquidated damages" provisions. *See LG Capital*, 307 F. Supp. 3d at 102 (clause imposing $250 per day penalty beginning on the fourth day after Notice of Conversion and $500 per day beginning on the tenth day unenforceable because damages "are clearly disproportionate to the potential loss"); *Union Capital*, 2017 WL 1406278, at *7 (striking down same penalty arrangement as "the prototypical forbidden penalty"). As in *LG Capital* and

*Union Capital*, the Note here even "expressly uses the word 'penalty'" to describe these damages. *LG Capital*, 307 F. Supp. 3d at 102; *see* Note § 8 ("the penalty shall be $250 per day . . ."). And as in those cases, "Plaintiff offers no explanation as to how a daily fee of $250, escalating to $500 after the tenth day on which defendant has failed to convert shares could bear a proportional relation to plaintiff's probable loss arising from defendant's failure to deliver conversion shares." *LG Capital*, 307 F. Supp. 3d at 102. Moreover, as discussed below actual damages here are readily ascertainable.

### 2. Failure to Deliver Loss/Make-Whole Provision

Alternatively, AB contends that, had it elected to enforce the "Make-Whole" provision, it would be entitled to $56,043.90 in damages (a high trade price of $.1275 on August 3, 2017 x 439,560). Goldstein Decl ¶¶ 47-49 & n.1. Although GNID objects only on usury grounds, the Court again addresses whether this provision is otherwise invalid.

In *LG Capital* and *Union Capital*, the courts addressed essentially identical "Make-Whole" provisions to the one at issue here. Those courts determined that the formula was "'designed to provide [plaintiff] with a guaranteed higher cash payout than a true make-whole measure, which would focus only on [plaintiff's] loss as a result of [defendant's] failure to abide by the terms of the bargain.'" *LG Capital*, 307 F. Supp. 3d at 103 (quoting *Union Capital*, 2017 WL 1406278, at * 7). Such provisions were "inappropriate where, as here, plaintiff's actual damages are a function of readily determinable information." *Id.*

The Court agrees with this analysis, and concludes that the Make-Whole provision is not enforceable.

### 3. Expectation Damages

As AB notes in its brief, and as the *LG Capital* and *Union Capital* courts held under similar circumstances, expectation damages are readily available here. AB's damages are "ascertainable through expectation damages, calculated by subtracting the contract price—the price at which [AB] is entitled to convert shares under the Note—from the market price of the shares on the date of the breach." *Union Capital*, 2017 WL 1406278, at * 6; *accord LG Capital*, 307 F. Supp. 3d at 103 (applying same formula).

Applying this formula, Plaintiff's expectation damages from the November 28, 2016 conversion are $8,168.80. Pl Mem at 12 & n.4.[3] As Plaintiff argues, it is further entitled to repayment of $5,000, the cost of conversion that Plaintiff would have recouped upon sale of the converted shares. *See id.* at 12 n.5.

Plaintiff also urges this Court to calculate expectation damages for conversion of the remainder of the Note. *Id.* at 12 n.6. While Plaintiff does not expressly allege that Defendant refused to honor any future notices of conversion, Defendant effectively did so by terminating its transfer agent. As the *Union Capital* court held in similar circumstances, the Court would award damages by taking the date of the breach and determining the conversion price AB was entitled to on that date, the number of shares AB was authorized to convert, and the market price of those shares on the date of the breach. *See Union Capital*, 2017 WL 1406278, at * 6. Applying this formula, Plaintiff's expectation damages for the remainder of the Note are $49,120.87. Pl Mem at 12 & n.4.[4] As Plaintiff argues, it is further entitled to repayment of 30,000, the cost of

---

[3] Plaintiff states that the price on date of breach was $.03, and the conversion price was $.011375, rendering expectation damages $.018625 per 439,560 shares. Pl Mem at 12 n.4.

[4] Plaintiff states that the number of shares to which Plaintiff would have been entitled to is 2,637,362, calculated by dividing balance of the Note ($30,000) by the conversion price ($.011375), rendering expectation damages $.018625 per 2,637,362 shares. Pl Mem at 12 n. 6.

conversion that Plaintiff would have been entitled to as the Note's outstanding balance. In total, Plaintiff is entitled to $92,307.67 in damages.

### 4. Fees and Costs

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (collecting cases). The parties' intent to provide fees as damages for breach of contract must be "unmistakably clear from the language of the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (citations and internal quotation marks omitted).

Here the parties unmistakably intended to provide attorneys' fees to the prevailing party. *See* Note § 7 ("The Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note."). GNID does not dispute the existence of this provision. For the reasons discussed above, AB has prevailed on its breach of contract claim. Thus, it is entitled to reasonable attorneys' fees.

In conclusion, the Court determines that there are no issues of material fact. Further, AB has successfully alleged each element of its breach of contract claim. As discussed below, GNID's usury defense is without merit. Accordingly, summary judgment for AB on its claims for breach of the SPA and Note is appropriate.[5]

---

[5] Plaintiff also brought claims for unjust enrichment and anticipatory breach. Neither party has subsequently addressed the anticipatory breach claim. Further, Plaintiff did not respond to Defendant's arguments that its unjust enrichment claim should be dismissed under the "unclean hands" doctrine. Def Mem at 29-32. "Whatever the merit of this argument, plaintiff has abandoned the[se] [] claim[s], as [its] motion papers fail to contest or otherwise respond to defendant['s] contention." *Moccio v. Cornell Univ.*, No. 09-cv-3601, 2009 WL 2176626, at *4 (S.D.N.Y. July 21, 2009); *accord Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that

## *Motion to Dismiss*

### I.   Legal Standard

"'Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings.'" *Vail v. City of N.Y.*, 68 F. Supp. 3d 412, 420 (S.D.N.Y. 2014) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)). The standard for dismissal under 12(c) mirrors that for 12(b): the complaint "must allege sufficient facts which, taken as true, state a plausible claim for relief." *Id.* (internal citations and quotation marks omitted). The Court may consider the complaint as well as "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted).[6]

### II.   Application

GNID argues that the entire complaint should be dismissed because the loan at issue was usurious and therefore void.

Usury laws prohibit exorbitant interest rates on loans. To state a usury defense, the defendant must allege that "the lender (1) knowingly charged, took or received (2) annual interest exceeding [the usury rate] (3) on a loan or forbearance." *Prof'l Merchant Advance*

---

the claim should be dismissed."). In any event, Plaintiff "may not ultimately recover under both the breach of contract and unjust enrichment claims." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (collecting cases) (emphasis omitted).

[6] As Plaintiff notes, "[w]hen matters outside the pleadings are presented in support of, or in opposition to[,] a [Rule 12(c) ] motion, a district court must either exclude the additional material and decide the motion on the [pleadings] alone [,] or convert the motion to one for summary judgment under [Rule 56] and afford all parties the opportunity to present supporting material." *Vail*, 68 F. Supp. 3d at 420 (citation and internal quotation marks omitted). The only additional materials considered in relation to Defendant's motion are the SPA and Note, which may be properly considered on a 12(c) motion as they were attached to the complaint as exhibits. *See* FAC.

*Capital, LLC v. C Care Serv's, LLC*, No. 13-cv-6562, 2015 WL 4392081, at *4 (S.D.N.Y. July 15, 2015) (citation and internal quotation marks omitted). "Usury is an affirmative defense and a heavy burden rests upon the party seeking to impeach a transaction for usury." *Adar Bays, LLC v. Aim Exploration, Inc.*, 285 F. Supp. 3d 698, 701 (S.D.N.Y. 2018) (citation and internal quotation marks omitted).

### A. Civil and Criminal Usury Statutes

New York law contains two usury provisions, one civil and one criminal. The civil usury statute prohibits loans at rates exceeding 16% per annum. N.Y. Gen. Ob. Law § 5-501. Contracts proscribed by the civil usury statute are void. However, importantly, a corporation may not assert civil usury as a defense in litigation. N.Y. Gen. Ob. Law § 5-521(1); *accord Hillair Capital Inv., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013).

The criminal usury statute prohibits loans at interest rates exceeding 25% per annum. N.Y. Penal Law § 190.40. Unlike with civil usury, a corporation *can* assert criminal usury as a defense. N.Y. Gen. Ob. Law § 5-521(3); *accord Hillair*, 963 F. Supp. 2d at 339. However, in contrast yet again with the civil usury statute, there is "no specific statutory authority for voiding a loan that violates the criminal usury statute." *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 190 n.4 (2d Cir. 2002); *accord Prof'l Merchant Advance Capital*, 2015 WL 4392081, at *5 n.4 (collecting cases).

GNID seeks to persuade this Court that the New York legislature "did not intend to create two different 'types' of usury" but instead "enacted the criminal provision to create two 'levels' of usury in a civil context." Def Reply at 6. Nevertheless, courts in this District routinely distinguish between the two types of usury when determining who may assert the defense and whether the resultant agreement should be voided. *See, e.g., Coastal Inv. Partners, LLC v. DSG*

*Global, Inc.*, No. 17-cv-4427, 2018 WL 2744719, at *5 (S.D.N.Y. June 6, 2018) ("[O]n its face, § 5–511 applies to civil, not criminal usury. Corporations, including Defendant in this action, cannot assert a civil usury defense."); *Ammirato v. Duraclean Intern., Inc.*, 687 F. Supp. 2d 210, 220-21 (E.D.N.Y. 2010) (differentiating between civil and criminal usury statutes); *Sabella v. Scantek Med., Inc.*, No. 08-cv-453, 2009 WL 3233703, at *16-17 (S.D.N.Y. Sept. 25, 2009) (same).

Accordingly, as a corporation GNID may not state a claim under the civil usury statue. This Court thus analyzes GNID's claim under the criminal usury provision.[7]

## B. Whether the Note is a Loan Subject to Usury Laws

The Court first addresses whether the Note is a loan, triggering the application of usury laws.

"The rudimentary element of usury is the existence of a loan or forbearance of money." *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017) (citation and internal quotation marks omitted). If there is no loan, "'there can be no usury, however unconscionable the contract may be.'" *Id.* (quoting *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (N.Y. 1992)). "In order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender." *Id.* (citation and internal quotation marks omitted). In this analysis, the transaction "must be 'considered in its totality and judged by its real character, rather than by the name, color, or form which the

---

[7] The Court notes that if it had analyzed the claim under the civil usury statute, GNID still would not have alleged a usury defense.

parties have seen fit to give it.'" *Id.* (quoting *Abir v. Malky, Inc.*, 59 A.D.3d 646, 649 (N.Y. 2d Dep't 2009)).

GNID argues that the transaction "is simply a loan with an exclusive option of the plaintiff to convert the loan into shares at some future time." Def Mem at 16. The Court assumes *arguendo* that the transaction constitutes a loan.

### C. Whether AB Intended to Charge a Usurious Rate

Under New York law, "[a] loan is usurious if the lender intends to take and receive a rate of interest in excess of that allowed by law even though the lender has no specific intent to violate the usury laws." *In re Venture Mortgage Fund*, 282 F.3d at 188 (citation and internal quotation marks omitted). "If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law." *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring, Inc.*, 105 A.D.3d 178, 183 (N.Y. 1st Dep't 2013) (citation omitted). However, "[w]hen a note is not usurious on its face, a court will not presume usury; rather, the party asserting the defense must prove all the elements," including "the lender's usurious intent." *Union Capital*, 2017 WL 1406278, at *4. This "intent must be shown by clear, unequivocal and convincing proof." *Phlo Corp. v. Stevens*, No. 00-cv-3619, 2001 WL 1313387, at *4 (S.D.N.Y. Oct. 25, 2001) (citations omitted). "There is a strong presumption against the finding of usurious intent and a loan is not usurious merely because there is a possibility that the lender will receive more than the legal rate of interest." *Id.* (citation omitted).

GNID contends that the Note is usurious on its face because the conversion discount option (35%), share reserve requirement (400%), and default remedies provisions, which are expressly stated in the Note, set the interest rate well above 25%. Def Mem at 25. However, GNID's own line of argumentation makes clear that the face of the loan is not usurious. It

simultaneously contends that the Note is unmistakably usurious on its face and that AB "cleverly disguise[d] various additional charges" that resulted in in "hidden" rates of interests. Def Mem at 32. GNID essentially contends that so long as a Court determines that an interest rate is *effectively* usurious, intent is implied. Yet the cases GNID cites make clear that intent is only "conclusively presumed" if "the note . . . *shows* a rate of interest higher than the statutory lawful rate." *In re Rosner*, 48 B.R. 538, 547 (Bankr. E.D.N.Y. 1985) (citation and internal quotation marks omitted) (emphasis added); *see also Venables v. Sagona*, 85 A.D.3d 904, 905 (N.Y. 2d Dep't 2011) (Note usurious on its face where it "expressly called for repayment of the principal sum together 'with interest' at a rate far in excess of 25%").

Here, in contrast, the Note provides for an 8% interest rate per annum. That rate is patently not usurious. *See Phlo*, 2001 WL 1313387, at *4 (Note providing for 14% interest rate per annum not usurious on its face). Intent is thus not implied.[8]

## D. Whether the Rate Was Usurious

The next issue is whether the Note's interest rate was usurious. "A loan is usurious where the lender is entitled to the return of the principal and the full legal rate of interest plus a bonus to be paid upon a contingency over which the borrower has no control." *Phlo*, 2001 WL 1313387, at *4. Courts have explained that "[t]his contingent right to a bonus is something of value and this value added to the maximum interest results in total interest in excess of the legal rate." *Id.* (citation omitted). Nevertheless, "[a]n agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is not ipso facto

---

[8] In its opposition to Plaintiff's motion for summary judgment, GNID further argues that the Note is intentionally usurious. However, as AB points out, the Note contains two usury avoidance clauses. *See* Note §§ 8, 9. While a "'usury avoidance clause' does not, by itself, save an agreement from a charge of usury," courts have held that it "may be relevant to the issue of intent." *Hillair*, 963 F. Supp. 2d at 338 n.1 (internal citations omitted). Given the existence of two usury avoidance clauses, the fact that the Note is not usurious on its face, and the lack of evidence of intent, the Court concludes that, on summary judgment, GNID has not met its burden of proving intent.

usurious, because of the possibility that more than legal interest must be paid." *Id.* (citation omitted).

### i.  Attorneys' Fees

GNID contends that the $2,000 of loan proceeds applied to attorneys' fees represents a "hidden interest" of 6% of the loan amount.  However, caselaw makes clear that a "borrower may pay reasonable expenses attendant on a loan without rendering the loan usurious," and that "[r]easonable expenses can include payments for attorneys' fees associated with the loan." *Hillair*, 963 F. Supp. 2d at 339 (citations and internal quotation marks omitted).  To be sure, when "fee payments do not actually reimburse lenders for expenses associated with the loan, and instead are a disguised loan payment, then such fee expenses can be considered in determining the interest rate." *Id.*  However, GNID adduces no evidence that the $2,000 fee did not legitimately reimburse plaintiff's attorneys' fees.

### ii.  Repayment Within 180 days

Next, GNID states that, under the Note, the principal plus interest actually had to be repaid within 180 days lest GNID be subject to AB's conversion option.  Def Opp at 13-14. Accordingly, it argues that the 8% face interest plus "6% in hidden interest as legal fees" paid off in a six-month period creates a 29% interest rate. *Id.* at 14.

Without regard to the rest of GNID's argument, for the reasons discussed above, the $2,000 attorneys' fees do not constitute interest.  Accordingly, this argument fails.

### iii.  Discount on Converted Stock

GNID argues that AB's 35% discount on the market price of GNID's stock must be considered interest.  It relies on cases holding that convertible notes containing both an unsecured debt and an option to convert shares should be valued separately in determining the effective

interest rate. *See, e.g., Hillair*, 963 F. Supp. 3d at 340 ("Defendants are correct that the stock payment should be taken into consideration in determining the interest rate.); *Sabella*, 2009 WL 3233703, at *17-18 (value of stock relevant to interest rate calculation for usury defense); Def Mem at 18-19. Thus, according to GNID the 35% discount has a separate value that must be counted because "for each $1.00 of principal and interest, defendant is required to pay back $1.35." Def Mem at 19. Moreover, GNID emphasizes that the conversion is entirely under AB's control as (1) AB has the sole conversion right and (2) the Note guarantees conversion at a "fixed rate on the lowest trading price from the 20 prior days upon the notice to convert," meaning that "there is no risk of loss to plaintiff upon conversion." *Id.* GNID then relies on *Blue Wolf* for the proposition that AB has "disguised" interest charges in an attempt to evade usury laws. *Id.* (citing *Blue Wolf*, 105 A.D.3d at 182).

As AB notes, however, cases relied on by GNID address Notes that required loan repayment *and* deliveries of shared stock, as opposed to delivery of stock *in lieu of* loan repayment. Under such circumstances, the stock value was plainly relevant to calculating the effective interest rate. Pl Opp at 16-17; *compare Hillair*, 963 F. Supp. 2d at 338 (contract provided for $165,000 loan to be repaid in the amount of $178,200 *plus* 500,000 shares of common stock) (emphasis added); *Sabella*, 2009 WL 3233703, at *18 ("in return for loaning money to Scantek, Sabella was entitled to receive shares of the company's common stock as *additional* consideration") (emphasis added) *with* Note § 4(a) (note-holder *may convert* amount of principal face of the Note into common stock) (emphasis added). Further, *Blue Wolf* addressed a fundamentally different Note, involving hundreds of thousands of dollars of deposits and fees that the court determined must be added to the interest rate calculation. *See Blue Wolf*, 105 A.D.3d at 183.

Much more to the point are cases cited by AB that considered Notes similar to the one at issue here and held that such discounts are not interest. For instance, *Union Capital* addressed a Note that, as here, had an 8% annual interest rate and allowed the lender "at any time to convert all or any amount of the principal face amount" of the Note into shares of the borrower's common stock. *Union Capital*, 2017 WL 1406278, at *1. There, the discount was 58% of the lowest trading price within thirteen days prior to receipt of notice. *Id.* Rejecting the borrower's argument that the discount should be calculated in considering the effective interest rate, the court held that the borrower:

> simply held an option to convert shares, and it could have elected to obtain repayment in cash, which would clearly not have been usurious. Moreover, even if Union chose to convert the loan principal into shares, any potential profit Union might realize would still be dependent on the market price at the time of conversion and so, therefore, would be too uncertain to incorporate into an interest rate calculation . . . Furthermore, even if the discount rate could be considered. [A] usury defense could no longer be applied against the loan once the Note principal was converted into equity.

*Union Capital*, 2017 WL 1406278, at *5 (collecting cases); *accord Beaufort Capital Partners, LLC v. Oxysure Sys., Inc.*, No. 16-cv-5176, 2017 WL 913791, at *3 (S.D.N.Y. Mar. 7, 2017) (option to redeem Notes for equity at discounted price should not be factored into interest analysis because "though the initial transaction took the form of a loan, upon conversion to equity, the loans likely have the character of an equity investment, and are thus no longer vulnerable to a usury defense"); *Adar Bays*, 285 F. Supp. 3d at 703 ("Adar Bays has at minimum stated a plausible claim that a right to convert loan principal into shares, even at a fixed percentage discount, is materially more uncertain than a right to receive cash and therefore should not be considered as interest in a usury calculation.").[9]

---

[9] GNID stresses that the Court must analyze usury "specifically and only at the time the loan was made." Def Mem at 16 (collecting cases). It argues that AB is impermissibly discussing the time of the loan *at conversion*. Def Reply at 8-9. However, AB does not appear to dispute the contention that usury is determined at the time the loan was

The Court agrees with AB that the 35% discount should not be included in the interest calculation. The conversion right was simply too uncertain at the time of contracting. As courts have noted, a myriad of circumstances could decrease the price of the stock, including that "Defendant could become delinquent in its filings, become delisted, experience sudden decreases in its stock price, experience no demand for its stock, or simply cancel the reserve or refuse a conversion." *Adar Bays*, 285 F. Supp. 3d at 702-03; *accord Phlo*, 2001 WL 1313387, at *5 ("[I]t was not clear that any effective interest rate in excess of 25% would ever have to be paid, as the value of the warrants was uncertain."). Accordingly, GNID has not carried its burden of showing that the discounted stock price should be considered in the interest calculation.

### iv. Share Reserve

GNID next contends that the share reserve that the Note required it to keep in order to effectuate conversions is part of the interest rate. Essentially, GNID argues that the initial reservation of 278,000 shares, and the requirement that it at all times reserve at least three times the amount of shares required if the Note were fully converted, is unlawful under § 5-511 as the reservation of a "greater sum" for the loan. *See* Def Mem at 20-21. Per GNID's calculations, the value of the reservation at the time the Note was executed was $144,560.00 based on the $35,000 principal, or *400%* of the value of the original loan. *Id.*

As AB states, GNID's argument does not hold. Chiefly, § 5-511 is the *civil* usury statute, which "cannot be asserted by a corporation" such as GNID. *Adar Bays*, 285 F. Supp. 3d at 704. In any event, GNID is not giving up the shares in reserve. They remain in control of GNID's agent while AB has the option to convert the shares, and are returned to GNID if AB does not exercise its option. As a court found when evaluating a similar Note, "the reservation of shares

---

made. It merely, and properly, makes the logical connection that money obtained after conversion into shares is not subject to usury laws.

was not an independent payment to Adar Bays, but merely a mechanism by which to effectuate the share conversion as envisioned by the Note and the SPA. Since the share conversion feature does not render the agreement usurious, neither does the reservation of shares provision." *Id.*

### v. Default Rates

GNID additionally seeks to add the 24% per annum default interest rate to the interest rate calculation. The parties debate whether New York's usury laws apply to default interest rates. The bulk of authority supports AB's contention that "default payments are separate and distinct from the actual interest rate and therefore are not relevant in determining if the rate is usurious." *Hillair*, 963 F. Supp. 2d at 340 (collecting cases).

However, GNID relies on a 2017 decision that applied the criminal usury statute to a credit card company's 32.24% default interest rate on an individual. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 138 (S.D.N.Y. 2017). After reviewing state and federal cases, the court in *Madden* concluded that, while it is clear that "the civil usury cap does not apply to defaulted obligations," the New York Court of Appeals has yet to rule on whether the criminal usury cap so applies and, were it to reach this issue, it likely "would hold that the criminal usury cap limits interest charged on debts to 25% annually, even for defaulted debts." *Id.* at 140-44. One court has since applied *Madden* to hold that "the criminal usury cap *does* apply to default interest." *Union Capital*, 2017 WL 1406278, at *8. However, other courts have declined to follow *Madden*'s analysis, instead following the "overwhelming authority" to the contrary. *LG Capital Funding, LLC v. One World Holding, Inc.*, No. 15-cv-698, 2018 WL 3135848, at *12 (E.D.N.Y. June 27, 2018); *see also Beaufort*, 2017 WL 913791, at *3 (collecting cases); *Adar Bays*, 285 F. Supp. 3d at 705 (describing split of authority).

This Court need not resolve this dispute, however, since the default interest rate here is 24% per annum, which does not exceed the criminal usury cap.[10]

### vi. Damages Provisions

GNID contends that the liquidated damages provisions of the Note bring the overall effective default interest rate above 25%. *See* Note § 8 (listing damages provisions). It relies on cases holding liquidated damages unlawful because they were grossly disproportionate to the possible loss and actual damages were not difficult to determine. *See Union Capital*, 2017 WL 1406278, at *7 (liquidated damages provision "unenforceable penalty"); *Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp.*, 310 F. Supp. 2d 556, 568 (S.D.N.Y. 2003) (liquidated damages "unconscionable" penalty that is "not intended to compensate [Plaintiff] for [Defendant's] breach).

As AB argues, whether the liquidated damages provisions here are unenforceable is a wholly separate question from whether they constitute interest for the purposes of New York's usury laws. Indeed, as discussed above the Court strikes the liquidated damages provisions. Accordingly, they cannot be considered part of the effective interest rate.

### E. Remedy

Finally, even if the Court had found that the Note was usurious, it would not necessarily be void. GNID contends that "[i]t is well settled law in New York that criminally usurious loans are *void ab initio*." Def Mem at 26 (collecting cases). Yet as numerous courts have recognized, "there is no specific statutory authority for voiding a loan that violates the criminal usury statute." *In re Venture Mortgage Fund*, 282 F.3d at 190 n.4. Since the Court determines that the Note is not usurious, it need not determine the appropriate remedy here.

---

[10] Since, as discussed above, GNID cannot assert a civil usury defense given its status as a corporation, the fact that the default interest rate exceeds the civil usury statute is of no moment.

## CONCLUSION

The Court has considered all of the parties' arguments. For the foregoing reasons, Plaintiff's motion for summary judgment on its breach of contract claim is GRANTED and Defendant's motion to dismiss is DENIED. Plaintiff's claims for unjust enrichment and anticipatory breach are deemed abandoned.

Plaintiff shall file its motion for attorneys' fees by October 22, 2018. Defendant shall file its response by November 26, 2018. Plaintiff's reply, if any, shall be due by December 10, 2018.

The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 47 and 51.

**SO ORDERED.**

**Dated:** September 20, 2018

       **New York, New York**

                             **HON. ANDREW L. CARTER, JR.**
                              **United States District Judge**